Judge Buckner,
delivered the opinion of the court.
"Daniel Halsted being indebted to the defendants in error, in a large sum of money, on the 30th of November, 18J4, executed to them, a mortgage *555 far a small tract of land, in the county of Fayette,-to secure the payment of it.
In June, 1817, the money being unpaid, he to them, a second mortgagé, including said tract, and-two lots of ground, in the town of: Lexington, as additional security for the sum aforesaid, for which they held' his notes.
At the September term of the Fayette circuit court, in the year-1819, the defendants in error, filed their bill s in chancery.against said Daniel and. John,setting.-forth those facts, and alleging that when the last mortgage was executed, the mortgagor fraudulently induced them-to believe that he was invested with the legal title, to the property mortgaged, when,, in truth, as to one of. the lots, being, that, which in said mortgage, is described, as situated on Cross-street, eighty four feet from-Third-street, he had only an equitable title,, under at bond executed by one Robert Holmes, to Joseph Barnett, who had assigned it to E. Noble, and he to said-Daniel.
They make the bond for said lot, with the mortgages,each of-which had been admitted to record, exhibits; and allége. that-said Daniel and John had combined to defraud them, as to the security which the secondmortgage was intended to furnish, respecting the last mentioned lot; and that John, with a knowledge of ' their lien thereon, had, .without the payment of any valuable consideration to said -Daniel, who was his father, procured Holmes, in whom the legal title was vested, to make a conveyance thereof to-him.
. The bill contains a prayer; that John D.. Halstead be compelled to convey the lot aforesaid to the -president, directors and co.,and for relief generally,. •
On the 23rd of March, 1820, they filed a second bill, in which they, make Daniel Halstead a defendant, the ■ object of which, was to foreclose-his equity-of redemption, in the mortgaged property- It was afterwards • ordered by the court, all parties consenting, that the two causes should be united; and the latter be consid-.. ered as a supplement to the former.
John D< Halstead answered,.that he was an innocent purchaser, without notice of -the equity relied on, and *556 makes the following statement,, respecting the circumstances, under which he became the legal owner of the lot, in controversy. His father was indebted to him, in the sum of $1351 52i- cents, for services rendered by hi'm,asa.elerk in, and manager of his factory; andas a collector of money, &c..from the 20th of April, 1817... to the 20th of June, 1819, as per his account filed, would appear. Being á young and unmarried man, until some short time before he obtained a conveyance of the lot, and having but little use for money, he had not demanded payment of his father, who was engaged in business which required considerable capita], until, the greater part of the services mentioned, had been performed* Owing to the embarrassment which gen-ally prevailed about that time, and the responsibilities, which his father had incurred as surety for others, who had failed, he- was unable to pay him money for his services, and therefore, proposed to sell to him, the lot in contest, at the price of $1000, in part discharge of the debt due to him, informing him, that he held a bond on Robert Holmes, for a conveyance thereof, but had lost; or mislaid it. He, John, reluctantly accepted the prop • osition, and as the only satisfaction which he could obtain, received from him, a written order, directed to Holmes, to convey to him sai'd lot.
Upon application to Holmes, he refused to comply with the request; whereupon, he instituted a suit in the Scott circuit court, to co-erce a conveyance. Holmes without answering to the suit, having previously consulted his lawyer, executed to him, for the lot, a déed., dated 22d of June, 1819, which was exhibited.
The deed purports to have been made upon a consideration, of $600, sets forth the bond of Holmes; its loss, and the written order from Daniel Halstead.
In the account exhibited by John against his father, his services- are charged at $800, per annum, with- credits given for money paid, and goods received, reducing the amount, to the aforesaid sum of $1351 52i cents.
Daniel Halstead, in his answer, acknowledges the execution of the two mortgages, and that he owed the debt, as claimed, except as to a part, which he had paid. He says, that the defendants in error, were fully apprized at the time they received the second mortgage *557 that the legal title to the lot, which had been since conveyed to his son, was in Holmes, because the bond on him for the conveyance, was then-put into their hands, where it still remained. He states the contract between himself and son, in about the same manner, that it is represented in John’s answer.
In, foreclosing^ errorSto leave it with the commissioner ¿^'’to^ecide whether pay-merit or ten- and to™ uthor-;ze him, in faufuto sell the p’roptrty.,.
He insists, that having paid a considerable part of. the amount, for which the mortgages were executed,, mainly by the aid which he had received from the services of his son; and as the forty-five acres had been • considered as furnishing sufficient security, on the execution of the first mortgage, the two lots having been included in the second, on account of further indulgence extended to him, he considered himself justified in acting as he had done, by paying his own honest debts in preference to those for which he was bound, as surety for others, which he alleges is the fact respecting the debts claimed by the bank, in this case.
Upon a hearing of the cause, as to D. Halstead, the circuit court decreed against him, that the property described in the mortgages, except the lot claimed by John, should be sold, &c. Upon the report of the commissioner who made the sales, it appeared that a considerable portion of the debt claimed, still remained undischarged. At a subsequent term, the cause was heard as to the lot conveyed to John-Halstead, when the court entered a further decree, directing a sale of it, in satisfaction of the money embraced in the first decree, except so much as had been made, by the sale of* the property, unless the money should be paid on or before a day named, in the decree, which was during the vacation of the court; and that J. D. Halstead should relinquish to the purchaser of it, all his right, title, &c.
To reverse this last decree, this writ of error is prosecuted. The errors assigned, question its propriety, as to both its details and merits. According, to the princi-pies laid down, in the case of Downing, &c. vs. Palmateer, I Mon. 64, it was erroneous to leave it to the commissioner to determine, whether the money had been paid. Upon that ground, therefore, a reversal of the decree, must be the consequence.
But as to the merits of the case, the decree was cor-recti That the mortgage was executed, transfering to *558 the complainants the equitable title, which Daniel Hal-stead held to the property in contest, to secure to them the'payments in the bill mentioned, cannot be doubled. Indeed it is not denied in either answer, and the de» fendánt, John, states, that upon its execution, the bond of Holmes was delivered to them by his co-defendant. But he expressly denies, that he had any knowledge of the existence of the mortgage, .or claim of tire complainants,. before he Received the deed from Holmes, founded upon a valuable consideration. The admission of ?hk mortgage to record, cannot be considered as furnishing constructive notice, as to the equity set up by the bank, The statute of this state applicable to the. subject, rendering it necessary to record mortgages, so as to give to the fact of recording, the effect of constructive notice, applies to those mortgages only, in which the legal title passes thereby to the mortgagees; see the case of the bank of Kentucky vs. Vance’s administrators, IV Litt. 168. The law does not require, that the mortgage Gf the equitable,title shall be recorded; It would be absurd, therefore, to say, that the performance of such an act, when the law does not require it, shall amount to constructive notice of it, to others. When one is about to purchase real property, knowing the law, and being desirous to satisfy himself as to the person with whom the legal title rests, he would exam-. ine the records o'f the offices in which, according to the statute regulating conveyances of the legal title, such conveyances must be recorded. If there be no deed transferring the title, from the man who holds it, there cannot be any constructive notice to him.
Statute making recorded mortgages constructive notice applies only to those mortgages which pass, the legal tille to the mortgagee Law does not require a mortgage of equitable title to be record’d
The recording of a mortgage of an equitable title to land, will not operate as constructive notice to a rabsequent ourchassrof the land from •fhe holder of the legal title.
But upon a careful examination of the record in this-case, various considerations are presented, creating, strong suspicions of the truth of the assertion by John Halstead, that he was a purchaser of the property in, controversy, for a valuable consideration paid, without notice of the bank’s prior equity.
He had been for about two years previous to the date of Holmes’ deed to him, engaged as clerk -for his father, and as his agent in collecting money., . He knew of his embarrassments, and was, as it may be reasonably inferred, acquainted with his property, if it be, true, to use his own language, that “he reluctantly accepted the proposition of his father, to let him have the *559 lot in contest, 'at the price of §1000, as the only satisfaction he could obtain. If ignorant of the existence of each of the mortgages, why did he overlook the tract of land and the other lot described in them, and conclude that this particular lot was the only satisfaction he could obtain?
But it appears, that Daniel Halstead owned other land about Lexington. On the trial of this cause, the clerk of the county court of Fayette, in obedience to a subpoena duces tecum, exhibited in court, and which were read as evidence, without objection, three deeds which had been admitted to record, in his office. The first was from Daniel Halstead to the defendant, John, conveying to him, for the consideration of §666 66 cents*, one third part of twenty acres, which had been sold by W. Mucton, in 1813, to said Daniel and others.
This deed bears date, on the 26thof June, 1819, only a few days after that from Holmes. The other seems to have no connexion with this controversy, and need not, therefore be noticed. They were introduced, we suppose, for the purpose of showing, that JohnD. Hal-stead had, in relation to the property conveyed by - them, been guilty of a fraud. But no such inference, is thereby fairly deducible. And were it otherwise, the perpetration of a fraud in other cases, would not prove his guilt in this. They had not been referred to, in the bill or answers, and if, objected to, should have been excluded; and we do not now notice that bearing date the 26th of June, for any. other purpose, than to deepen the cloud of suspicion, which overhangs his - answer, by showing that the lot in contest was not the only property, which his father might have sold to him, towards satisfying his demand.
It is moreover apparent from his answer, that before he received the deed from Holmes, he knew that his father was embarrassed by debts as surety or endorser for others. Speaking of the demand which he had against his father, he says, “The said Daniel being unable to pay said account, owing to the embarrassment of the times, and the responsibilities he had. incurred for others, who had failed,offered to sell to this defendant the lot.” Who those other persons were, is stated in another part of his "answer. The mortgage in the-bill mentioned, was executed to secure the payment of ne *560 gotiable notesl drawn by Daniel Halstead, - payable to some of those very persons, and endorsed by them to 'the bank. Upon these notes, no suit had been instituted at the time that he alleges, he made the contract with his father. It is not asserted that his father had at that time, parted with any of his property, towards the discharge of those debts. Yet, according to his statement, it 'was the embarrassment growing out of them, which rendered the father unable to pay him, and induced the son to accept the lot at the price of $1000. How he could have known that those debts rendered Daniel Halstead unable to discharge his demand, with any other property, except the lot conveyed by Holmes, unless he knew of the existence of the mortgages, it is difficult to conceive.
Was not his knowledge of his father’s embarrassments; of the persons for whom he was surety, and consequently of the persons to whom the debts were due, ■taken in connexion with the fact, that the lot in contest was the only propeity 'offered by his father, in- discharge of his demand; and his further knowledge, that his father was not able to produce Holmes’ bond sufficient to put him on the search, as to the person, wih whom the equitable title rested? And any matter, which would produce such an effect, according to the language used by this court in the case of Knox vs. Thompson, I Litt. 353, is sufficient to convict him of notice.
But there is one other view of this case, necessary to be taken, which in connexion with the preceding ■considerations, is in our1 opinion, conclusive against the defence set up by John D. Halstead.. In the case of Harts devisees vs. Hawkins’ heirs, &c. it is said, “now the law is too clearly settled to be questioned by us, that both the consideration must be paid, and the conveyance executed to protect the purchase from the prior, and therefore, superior equity of the complaining party.” See also the authorities there cited.
Sugden also, in speaking on this subject says, “the plea must 'distinctly aver, that the consideration money mentioned in the deed, was bona, fide, and truly paid independently of the recital of the purchase deed; for if the money be not paid, the plea will be overruled, ■as the purchaser is entitled to relief, against the payment of it,” page 544.
Hoggin, for plaintiffs; Crittenden, for defendants;
Now, there is no evidence in the cause, which proves that the consideration of ÑlO'iO, at which it is alleged* in the answer of the plaintiff» in error, the lot was sold to John D. Halstead, was paid. The depositions show that services were performed by the son for the father as charged, and that they ‘were worth ¿'800 per annum. But that there was any agreement between the parties, that a credit of $1000, or for any other sum, should be allowed by John to his father, on account of the lot; or that any such credit was given is unsupported by any proof in the cause. If it be necessary, independently of the recital in a deed, to show that the purchase money has been paid, upon whom must the onus probundi rest? Certainly upon the purchaser. The man claiming the prior equity, must show the existence of such prior equity; but he cannot bé held to prove, that the purchase money has not been paid by the person claiming to be an innocent purchaser. To require him to do it, would be in violation of a well ■known maxim of the law, '■'•Lex nanquam cogit vana, seu impossibilia.”
We will not say, that payment may not he" inferred, even if it be necessary to prove the payment of the whole consideration; but such an inference should be indulged in those cases only, which fairly and fully warrant it-. We do not think this such a one.
But we do not intend to determine in this case, (because it is not necessary) that it must appear, that the whole of the consideration has been paid, to entitle a purchaser to protection, as it has been already remarked, that there is no proof* that any part of it has been paid or agreed to be paid.
The decree of the circuit court must he reversed, and the cause remanded for further proceedings to be had, not inconsistent with this opinion.